UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Rebecca Florence Virnig,              13-cv-1539 (PJS/TNL)

       Plaintiff

   v.                  **REPORT AND RECOMMENDATION**

Carolyn W. Colvin,
Acting Commissioner of Social Security

       Defendant.

---

Laurence Reszetar, Esq., Maslon Edelman Borman & Brand, LLP, for Plaintiff.

Ann M. Bildtsen, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Defendant.

---

TONY N. LEUNG, United States Magistrate Judge.

Plaintiff Rebecca Florence Virnig ("Virnig") disputes the Commissioner's denial of her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Judicial review in the United States District Court for the District of Minnesota is proper under 42 U.S.C. §§ 405(g) and 1383(c)(3). This matter is before the Court, United States Magistrate Judge Tony N. Leung, for a report and recommendation to the United States District Court on the parties' cross motions for summary judgment. *See*, 28 U.S.C. § 636(b)(1); D. Minn. L.R. 72.1-2. Based on the record and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion

for summary judgment be denied, and Defendant's motion for summary judgment be granted.

## I.   BACKGROUND

### A.   Procedural History

Virnig was 42-years-old on her alleged disability onset date.  (Tr. 28.)[1]  She alleged disability from arthritis, back pain, knee pain, shoulder pain and right foot pain.  (Tr. 188.)  In an updated disability report in 2011, Virnig alleged a new injury of her left arm.  (Tr. 221.)  Virnig's representative also completed a disability report in 2011, stating she believed the claimant had serious mental health concerns.  (Tr. 227.)  Virnig's applications were denied initially and upon reconsideration.  (Tr. 80-84, 93-98.)  She requested a hearing, and a hearing was held on June 5, 2012, before Administrative Law Judge Jeffrey W. Hart ("ALJ").  (Tr. 8-9, 36-69.)  On July 6, 2012, ALJ Hart denied Virnig's claim.  (Tr. 10-35.)  Virnig requested review of the ALJ's decision by the Appeals Council, and the Appeals Council denied review.  (Tr. 1-9.)  The ALJ's decision, therefore, became the final decision of the Commissioner of Social Security.  *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner).  Virnig initiated the present action for judicial review on June 24, 2013.

### B.   Employment History

Virnig worked as a census taker for short periods in 2009 and 2010.  (Tr. 200.)  She worked part-time as a personal care attendant ("PCA") after her alleged onset of disability.  (Tr. 39.)

---

[1] The Court uses the abbreviation "Tr." to reference the transcript of the Administrative Record, Doc. No. 11.

### C.    Medical Records

The following medical records are relevant to Virnig's arguments that the ALJ failed to develop fully and fairly the record regarding her mental impairments, and that the ALJ failed to include mental and right hand limitations in the residual functional capacity finding.

### 1.    Mental Impairments

Virnig went to Lakewood Clinic Motley to establish care on October 27, 2003, and she reported she had been on disability since 1998, based on mental, emotional, and physical abuse.  (Tr. 267.)  She was not, however, seeking treatment for mental impairments, and she would not release her former medical records, but she reported a history of depression.  (*Id.*)  In January 2004, Virnig needed documentation of a doctor visit for a disability hearing, but she did not want treatment.  (Tr. 266.)  She said her disability was mental but offered no further explanation.  (*Id.*)  On March 29, 2004, Virnig reported she was being "taken off" disability by one of her physicians in Little Falls.  (Tr. 268.)[2]  In August 2004, Virnig reported she had to work because she lost her disability.  (Tr. 269.)

Almost a year later, in July 2005, Virnig underwent a pulmonary evaluation for shortness of breath, and she described having some very unusual reactions to different medications.  (Tr. 451.)  For example, taking a steroid for five days made her feel suicidal and homicidal.  (*Id.*)  Dr. Orleen Hoffman at Allergy and Asthma Associates opined that Virnig was unlikely to have an underlying pulmonary problem, but she might

---

[2] A Disability Report completed for Virnig by a Social Security Field Office representative on February 10, 2010, indicated there was an ALJ decision on February 13, 2004 finding "medical cessation" of Virnig's disability.  (Tr. 184-85.)

easily have "some psychological issues."  (Tr. 452.)   In several doctor visits, Virnig's clinical review of systems[3] was negative for depression and anxiety.  (Tr. 456, 512.) Chronic anxiety and depression were, however, occasionally included in her past medical history.  (Tr. 472, 474, 477.)

On January 31, 2007, Virnig saw Dr. Peter Dunphy at Brainerd Medical Center, and she complained of shakiness, malaise, and chronic confusion.  (Tr. 255.)  She said she had been knocked out in a car accident in the past and wondered whether this was causing her confusion.  (*Id.*)  Her thoughts seemed to be wandering, and she was a vague historian.  (*Id.*)  Dr. Dunphy ordered a brain MRI, and if it was negative, he suggested psychometric[4] testing.  (*Id.*)  The MRI was negative, apart from minimal old small vessel ischemic change.  (Tr. 447.)

Several years later, on November 1, 2010, Virnig underwent a consultative orthopedic examination with Dr. David M. Van Nostrand in support of her application for Social Security disability.  (Tr. 338-41.)  Dr. Van Nostrand reviewed Virnig's medical records, noting she had a history of mental health problems.  (Tr. 340.)  In her review of systems, Virnig reported suffering panic attacks that caused her to black out.  (Tr. 339.)

When Virnig saw Nurse Kelly Shefland at CentraCare Women's and Children's Clinic for a physical examination on March 8, 2012, Virnig complained of fatigue and

---

[3] "The Review of Systems (ROS) is an inventory of specific body systems performed by the physician in the process of taking a history from the patient.  The ROS is designed to bring out clinical symptoms which the patient may have overlooked or forgotten.  In theory, the ROS may illuminate the diagnosis by eliciting information which the patient may not perceive as being important enough to mention to the physician."  Review of Systems, E/M University, available at http://emuniversity.com/ReviewofSystems.html

[4] Psychometry is the discipline pertaining to psychological and mental testing, and to any quantitative analysis of an individual's psychological traits or attitudes or mental processes.  *Stedman's Medical Dictionary* ("*Stedman's*") 1477 (27th ed. 2000).

depression.  (Tr. 513.)  She had problems with depression in the past, and now she wanted to do nothing but sleep.  (*Id.*)  Virnig agreed to follow up for her depression.  (Tr. 514.)  She returned on March 14, 2012, and reported having been diagnosed with post traumatic stress disorder after her first husband died, when she was in her twenties.  (Tr. 519.)  She had also been a rape victim, conceiving a child from the rape.  (*Id.*)  If she was diagnosed with depression, she intended to treat herself with herbal remedies.  (*Id.*)

Virnig's symptoms were sadness, hopelessness, difficulty sleeping, fatigue, decreased energy, poor concentration, and low self-esteem.  (*Id.*)  She thought of suicide, and stated she could only kill herself if she also killed her daughter and animals because she could not leave them behind.  (*Id.*)  Virnig assured Shefland she would never do this.  (Tr. 520.)  Virnig had lost her house to foreclosure, and she was separated from her husband.  (*Id.*)  She lived in the country, in a home that was in poor repair.  (*Id.*)  She had a counselor in the past, and she had the name of a new counselor whom she planned to contact.  (*Id.*)  Virnig had a hard time staying on topic.  (*Id.*)  Shefland believed Virnig's past trauma was the root of her depression.  (Tr. 520-21.)  Virnig agreed to follow up with a counselor.  (Tr. 521.)  When Virnig saw an orthopedist for back pain on November 28, 2011, Virnig's review of systems was positive for depression, paranoia, and anxiety.  (Tr. 555.)

### 2.  Right Hand Impairments

In response to her complaints of right hand pain, Virnig had an x-ray of her right hand on February 25, 2004.  (Tr. 271.)  The x-ray did not show any abnormalities.  (*Id.*)  One month later, Virnig's right hand grasp was slightly weaker than her left hand.  (Tr.

269.)  Although she recently had a negative x-ray, she wanted another x-ray because she felt a lump in her fifth finger.  (*Id.*)  Clinically, the lump was most consistent with a hematoma.  (*Id.*)  On August 2, 2004, Virnig complained of pain in the joints of her hands.  (*Id.*)  Any time she worked with her hands, her PIP joints ached.  (*Id.*)  She was right hand dominant.  (*Id.*)  Virnig was advised to continue activity with her hands as tolerated.  (Tr. 270.)

Approximately four years later, on May 20, 2008, Virnig had another right hand x-ray.  (Tr. 300.)  The x-ray showed mild to moderate degenerative changes.  (*Id.*)  Several months later, Virnig shut her right thumb in a car door, and the x-ray showed mild degenerative changes and no fracture.  (Tr. 303-04.)

On November 1, 2010, Virnig underwent a consultative orthopedic examination with Dr. David Van Nostrand, for evaluation of her Social Security disability claim.  (Tr. 338-41.)  He diagnosed osteoarthritis of her hands, with Heberden's nodes.[5]  (Tr. 338, 341.)  Her hands appeared somewhat abnormal, but she did not have findings of rheumatoid arthritis.  (Tr. 339.)  On examination, her right hand grip was weaker than her left hand, and she was unable to make a strong fist with either hand.  (Tr. 340.)  Dr. Van Nostrand's medical opinion was that Virnig had essentially an unremarkable physical examination, but due to her osteoarthritis she had trouble lifting more than ten pounds occasionally.  (Tr. 341.)  In May 2011, Virnig suffered right hand pain after falling.  (Tr. 406.)  An x-ray of her right fourth finger showed significant degenerative changes.  (Tr. 412.)

---

[5] Heberden's nodes are bony bumps on the finger joint closest to the fingernail. Heberden's and Bouchard's Nodes, available at http://www.webmd.com/arthritis/heberdens-and-bouchards-nodes.

6

In December 2011, Virnig started having right hand and elbow pain after lifting a disabled client in her work as a PCA.  (Tr. 554.)  On examination in February 2012, she had full flexion and extension at the elbow without instability.  (Tr. 24.)  She could make a fist and fully extend her fingers, but she tested positive for Phalen's,[6] Tinel's[7] and compression signs.  (*Id.*)  Physical therapy did not provide much relief of her right arm pain.  (Tr. 552.)  In March 2012, examination of her right wrist was normal, but she was given a cast for rest.  (*Id.*)  In April, the cast was removed because it was causing discomfort, and her right arm was splinted.  (*Id.*)  On April 27, 2012, she was given a D-ring brace, and she could start stretching exercises at home.  (Tr. 549.)  She continued to work as a PCA.  (*Id.*)

### D.    State Agency Physician Opinions

On November 29, 2010, upon initial review of Virnig's application for disability benefits, Dr. Cliff Phibbs reviewed Virnig's Social Security disability file.  (Tr. 351-62.) He opined that Virnig would have the following physical residual functional capacity: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand or walk six hours in an eight-hour day; sit for six hours in an eight-hour day; unlimited push and pull; never climb ladders, ropes or scaffolds; occasionally crouch; frequently climb ramps and stairs, balance, stoop, kneel and crawl; and avoid firm gripping with the left

---

[6] Phalen's sign is tingling, numbness or pain in the fingers when you hold your arms out in front of you and flex your wrists, then let your hands hang down for about sixty seconds.  A positive test suggests carpal tunnel syndrome.  Physical Exam for Carpal Tunnel Syndrome, available at http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome.

[7] Tinel's sign is a sensation of tingling or pins and needles felt along the course of a nerve when percussed, and it indicates a partial lesion or early regeneration in the nerve.  *Stedman's* at 1640.

hand and wrist.  (Tr. 352-55.)  Dr. Phibbs discounted Dr. Van Nostrand's ten pound lifting restriction because it was inconsistent with the medical evidence of record and with Dr. Van Nostrand's finding that Virnig had an "unremarkable physical examination." (Tr. 357.)  On March 15, 2011, Dr. George Salmi reviewed Virnig's Social Security disability file upon reconsideration of her disability claim.  (Tr. 401-04.)  He affirmed Dr. Phibbs' opinion.  (*Id.*)

### E.    Function Reports

Virnig was interviewed by a Social Security Field Office Interviewer on April 19, 2010.  (Tr. 186.)  The interviewer noted Virnig tended to ramble on and had to be redirected to the interview many times.  (*Id.*)  In a function report, Virnig disclosed to the SSA that she suffered depression and anxiety.  (Tr. 237-40.)  She talked about how hard she worked doing chores and teaching her daughter.  (Tr. 237-38.)  Sometimes, she was so physically and mentally tired that she forgot to eat.  (Tr. 237.)  At the end of her narrative, Virnig said "I just wish I could sleep 6 [hours] uninterrupted every night.  I don't know if it is because of the polyps, the dreams or the PTSD that wakes me up 2-3x a night."  (Tr. 240.)  In a function report Virnig completed for the SSA on May 5, 2010, she reported having nightmares that awoke her, and some of her PTSD symptoms had returned.  (Tr. 212.)  She also noted, in response to a question about unusual behavior or fears, "that my home is going to burn down, that my neighbor is going to break into my home to harm my daughter, that because I can't breathe right, I will suffocate in my sleep and my daughter will find me."  (Tr. 217.)

### F.    Hearing Testimony

Virnig testified at a hearing before ALJ Jeffrey W. Hart on June 5, 2012.  (Tr. 36-

58.)  At the time of the hearing, Virnig was working eighteen to twenty hours per week as a PCA.  (Tr. 39.)  She started the job in April 2011, and there were a couple of occasions when she had worked full time.  (Tr. 40-41.)  Virnig also home-schooled her seventeen-year-old daughter.  (Tr. 41-42.)  Her daughter is dyslexic and has an auto immune disorder.  (Tr. 42.)

Virnig believed she could not work full time, mostly due to physical issues, but she also had emotional issues.  (Tr. 43.)  She separated from her husband and moved to a rental home in November 2011.  (Tr. 44.)  The landlord allowed her to keep her farm animals including a horse, three ponies, two goats, a cow, nine dogs, cats and two rabbits.  (*Id.*)  Virnig wanted to break her horse for riding, but she had been unable to work with him due to injuries from her car accidents.  (Tr. 49-50.)

Virnig testified that she had a problem with her right arm after injuring it in December of the previous year.  (Tr. 46.)  She hurt her arm while lifting a client.  (Tr. 51.)  Virnig was diagnosed with tendonitis, and it prevented her from lifting even a sixteen ounce drink.  (*Id.*)  Before her right arm injury, she was able to lift twenty to forty pounds.  (Tr. 47.)  She continued to work part time, despite her pain, because she had no choice.  (Tr. 55-56.)

Virnig had a history of treatment for mental health problems but was no longer in treatment because she had a bad experience with a psychologist.  (Tr. 56.)  She testified that her mental health issues did not presently affect her ability to work.  (Tr. 57.)  Then, upon questioning by her counsel, she added that she worked short hours, and she would not let her mental health issues interfere with work.  (*Id.*)  Mentally, she did not feel she could sustain full time work.  (*Id.*)

Steven Bosch testified at the hearing as a vocational expert.  (Tr. 58-68.)  The ALJ posed a hypothetical vocational question to Bosch, telling him to assume an individual of Virnig's age, education and work history, who was limited to light work;[8] never climbing ladders, ropes or scaffolds; occasional crouching; and avoid firm gripping and grasping with the non-dominant hand.  (Tr. 59.)  Bosch testified that such a person could perform Virnig's present job as a companion[9] at a light exertional level. (*Id.*)

The ALJ posed a second hypothetical question, adding that the person would also require a sit/stand option, meaning the person could alternate between sitting and standing without going off task, and consecutive standing would be limited to one hour at a time.  (Tr. 60.)  Bosch testified that such a person could perform the companion job he had identified, and the jobs of office helper[10] and cashier.[11]   (*Id.*)   For a third hypothetical question, the ALJ added the restriction of inability to handle objects with the dominant hand.  (Tr. 61.)  Bosch testified this restriction would rule out all work.  (*Id.*) The ALJ clarified that he meant the person could occasionally "finger" with the dominant hand, but there were no restrictions on reaching and overhead reaching, the restriction was limited to "handling" with the dominant hand.  (*Id.*)  This clarification did not change Bosch's testimony.  (*Id.*)  In response to questioning by Virnig's counsel, Bosch testified that a person who was limited to lifting ten pounds could not perform the companion job

---

[8] Light work is defined in the regulations as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  A job in this category might require "a good deal of walking or standing . . ."  20 C.F.R. § 404.1567(b).

[9] Dictionary of Occupational Titles ("DOT") Code 309.677-010, with 2,000 such jobs in Minnesota.

[10] DOT 239.567-010, with 5,000 such jobs in Minnesota.

[11] DOT 211.462-010, with 5,000 such jobs in Minnesota.

he had identified.  (Tr. 68.)

G.    **ALJ's Decision**

On July 6, 2012, ALJ Hart made the following findings and conclusions on

Virnig's claim:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since February 14, 2004, the alleged onset date   (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease and arthritis.   (20 CFR 416.1520(c) and 416.920(c)). . . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). . . .

5.    . . . [T]he claimant requires a sit/stand option whereby the claimant alternates between sitting and standing whereby consecutive standing is limited to one hour consecutively and there is no limit on sitting.   The claimant is further limited to no climbing ladders, ropes or scaffolds; occasional crouching and avoiding firm gripping and grasping with the non-dominant hand. . . .

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 2, 1961, and was 42 years old, which is defined as a younger individual, age 18-49, on the alleged disability onset date.   The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)). . . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, since February 14, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-29.)

At step two of the disability evaluation process, the ALJ found that Virnig's medically determinable impairments of depression and PTSD were nonsevere. (Tr. 17.)[12]  The ALJ acknowledged that Virnig's representative had requested a mental status examination, but Virnig had not reported mental health issues when she filed her applications for disability, and she had not sought any mental health treatment. (*Id.*) Although the record raised some concern that there might be a mental health condition at issue, Virnig had not sought therapy or medications for anxiety or depression. (*Id.*) Her mental status examinations were normal. (*Id.*)  In January 2012, she reported having no problems with depression, anxiety, substance abuse or psychosis. (*Id.*)

Virnig underwent a depression consultation in March 2012, stating she intended to treat herself with herbal remedies. (*Id.*)  The evaluating nurse thought Virnig was

---

[12] In the ALJ's subsequent discussion of the credibility of Virnig's subjective complaints, he noted that Virnig gave conflicting statements to her treating providers about whether she was pursuing disability based on physical or mental impairments. (Tr. 19.)

depressed, and Virnig said she would contact a counselor.  (*Id.*)  At the hearing, Virnig testified she was mentally stable.  (*Id.*)

In further evaluation at step two, the ALJ examined the four functional areas set out in the disability regulations for evaluating mental disorders.  (*Id.* at 17 citing section 12.00C of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.)  The ALJ found Virnig had only mild limitations in the first three functional areas:  1) activities of daily living; 2) social functioning; and 3) concentration, persistence or pace.  (*Id.*)  In the fourth functional area, episodes of decompensation of extended duration, Virnig had none.  (*Id.*)  Thus, under the regulations, Virnig's mental impairments were nonsevere. (*Id.* citing 20 C.F.R. 404.1520a(d)(1) and 416.920a(d)(1)).

In assessing Virnig's RFC, the ALJ considered the credibility of Virnig's subjective complaints.  (Tr. 18-28.)  In October 2003, Virnig established care at a new clinic due to a conflict of interest at her previous clinic.  (Tr. 19.)  She reported to her new clinic that she had been deemed disabled due to mental, emotional and physical abuse since the summer of 1998.  (Tr. 20.)  In January 2004, Virnig sought treatment for back pain but did not really want treatment; she wanted to document her doctor visit for disability purposes.  (*Id.*)  She said her disability was based on mental instability, not back pain, although her back pain was always present.  (*Id.*)

On August 2, 2004, Virnig sought treatment for a variety of pain complaints, including the joint of her right third finger.  (*Id.*)  Over the last months, the joints in her fingers ached when she used them.  (*Id.*)  She also reported during this visit that she had lost her disability and now had to work.  (*Id.*)  The treating provider was unsure of the reason Virnig was applying for disability again.  (*Id.*)

The ALJ assessed Virnig's activities of daily living.  (*Id.*)  She could perform personal care, cook, clean, drive a car, manage money, spend time with others, care for numerous farm animals, and load a wood boiler.  (Tr. 26-27.)  When her wrist pain improved, she quilted and used a computer.  (Tr. 27.)  In April 2012, although wearing a splint on her right arm, Virnig traveled to Texas for a family meeting.  (*Id.*)  Furthermore, since the alleged onset date, Virnig home-schooled her daughter who had special needs; she was learning to break a horse; and she cared for numerous farm animals. (*Id.*)  Many of her pain complaints were related to injuries from caring for her animals. (*Id.*)  The ALJ concluded Virnig was engaged in strenuous work activity.  (*Id.*)  Virnig also worked for the census bureau on three occasions since her alleged disability onset date, and she was let go for performance reasons unrelated to disability.  (*Id.*)  She also engaged in "fairly physical" work as a PCA.  (*Id.*)  The ALJ commented that it was surprising Virnig found time to work at all, given her busy and demanding lifestyle.  (*Id.*) She, nonetheless, had a sporadic work history that did not bolster her credibility.  (*Id.*)

The ALJ rejected the consultative examiner's opinion that Virnig could not lift more than ten pounds occasionally due to osteoarthritis because the examiner stated Virnig had "an essentially unremarkable physical examination."  (Tr. 27-28.)  Virnig reported she could carry five gallon pails of water for her animals.  (Tr. 28.)[13]  There were no treating physician opinions restricting Virnig's functioning.  (*Id.*)  The ALJ gave great weight to the State Agency medical consultants' opinions because they were

---

[13] The ALJ cited a March 2012 medical record where Virnig reported that she had to "haul in water for all of their needs," and she had many animals to care for.  (Tr. 520.) He also cited her physical therapy visit on March 19, 2012, where Virnig reported she had to carry five gallon containers of water because the well at her home had gone dry. (Tr. 569.)

based on reviews of the objective medical records, and the consultants were experts in standards for disability. (Tr. 27.) Furthermore, there were no additional objective findings in the record after the consultants performed their reviews. (*Id.*)

## II.   DISCUSSION

### A.   Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." *Id.* (quotation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Yet, the Court must consider evidence supporting and detracting from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

To be entitled to benefits, a claimant must be disabled as defined in the Social Security Act. 42 U.S.C. §§ 416(i)(1) and 423(d). A "disability" is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.*; *and see*, 20 C.F.R. §§ 416.905 and 404.1505. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning

of the Social Security Act.   20 C.F.R. §§ 416.920(a)(4) and 404.1520(a)(4).   The five steps are (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) based on his RFC, whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.   *Id.* at §§ 416.920(a)(4)(i-v) and 404.1520(a)(4)(i-v).   The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.   *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 416.912 and 404.1512; *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991.)

## B.   Issues

Virnig raises two issues in support of her motion for summary judgment.   (Pl's Mem. in Supp. of Mot. for Summ. J. ("Pl's Mem.") at 2, Doc. No. 18).   First, she contends the ALJ's failure to order a mental health evaluation was prejudicial error requiring remand.   (*Id.* at 8-10.)   Second, she argues the ALJ's failure to incorporate her mental health limitations and right hand limitations into the RFC finding rendered the ALJ's decision invalid.   (*Id.* at 10-12.)   The Commissioner responds that Virnig has failed to demonstrate the probative value of a psychological consultative examination or that she suffers any limitations from mental health impairments.   (Def's Mem. in Supp. of Mot. for Summ. J. ("Def's Mem.") at 6, Doc. No. 20).   The Commissioner contends the ALJ properly determined that Virnig's mental impairments were nonsevere.   (*Id.* at

5-7.)  Similarly, the ALJ properly determined that Virnig had no right hand limitations. (*Id.* at 7-8.)

In reply, Virnig asserts that a claimant's failure to list or disclose a mental health condition is not dispositive of disability.  (Pl's Reply Brief in Supp. of her Mot. for Summ. J. ("Pl's Reply") at 1-2, Doc. No. 21.)  Furthermore, even conceding that Virnig's self-report was insufficient to establish that she had a severe mental impairment, the ALJ should have ordered an objective evaluation of her mental health.  (*Id.* at 3-6.)  Finally, because the ALJ acknowledged that Virnig had impairments of PTSD and depression, the ALJ was obligated to include these impairments, distinguished from limitations caused by the impairments, in his RFC finding and in the hypothetical question to the vocational expert.  (*Id.* at 5-6.)

### 1.    Failure to Order a Mental Health Evaluation

Virnig asserts that the references to her mental health problems in her medical records put the ALJ on notice that he had a duty to develop the record.  (Pl's Mem. at 8.)  She contends that because the record did not contain objective mental health evidence, the ALJ should have ordered a consultative examination, pursuant to 20 C.F.R. § 404.1519a(b)(1-5).  (*Id.* at 9.)  The failure to order a consultative examination was prejudicial, she contends, because such an examination may have resulted in a finding of a severe mental impairment.  (*Id.* at 10.)  In her reply brief, Virnig asserts a consultative examination will remedy the ALJ's error of relying on his own opinion, without basis in the medical evidence, that her mental health impairment caused only minimal limitations.  (Pl's Reply at 4.)

The Commissioner asserts that Virnig's unsubstantiated self-reports of mental health difficulties do not establish a severe impairment, and Virnig has failed to establish the probative value of a consultative examination. (Def's Mem. at 6.) Furthermore, Virnig testified that her mental health does not interfere with her ability to work. (*Id.*)

The regulations direct the ALJ's evaluation of a claimant's mental impairments. The first step requires evaluation of the pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ must document, in a written decision, the special technique for analyzing the impairment. *Id.* § 404.1520a(e)(4). Under the special technique, the ALJ[14] must rate the degree or severity of a claimant's functional limitation based on the extent the impairment(s) interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis, addressing four broad functional areas. *Id.* § 404.1520a(c)(2). The four functional areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. *Id.* § 404.1520a(c)(3). In the first three areas, the ALJ rates the limitation as none, mild, moderate, marked or extreme. *Id.* § 404.1520a(c)(4). If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the ALJ will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation" in the ability to do basic work activities. *Id.* § 404.1520a(d)(1).

---

[14] The regulations also allow a state agency consultant or the Appeals Council to document application of the technique for evaluating mental impairments. 20 C.F.R. § 404.1520a(e).

> The [ALJ's] decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitations in each of the function areas described in paragraph (c) of this section.

*Id.* § 404.1520a(e)(4).

If the ALJ cannot get the information he or she needs from the claimant's medical sources, the ALJ may order a consultative examination.   20 C.F.R. § 404.1519a(a) (2012).  Examples of when an ALJ might order a consultative examination include:  (1) when additional evidence that is needed is not contained in the medical records; (2) evidence that might have been available from the claimant's medical sources cannot be obtained for reasons beyond his or her control; (3) highly technical or specialized evidence is needed but is not available from treating sources; and (4) there is a change in the claimant's condition that is likely to affect his or her ability to work, and the current severity of the impairment is not established.  *Id.* § 404.1519a(b)(1-4).

Here, the ALJ found Virnig has medically determinable impairments of PTSD and depression.  (Tr. 17.)  The ALJ documented his application of the special technique for evaluating the severity of functional limitations caused by Virnig's PTSD and depression in his written decision.  (*Id.*)  He found that Virnig had mild limitations in the first three functional areas and no episodes of decompensation.  (*Id.*)  The issue is whether the ALJ should have further developed the record by ordering a consultative examination to assist him in rating the severity of Virnig's PTSD and depression.

An ALJ must fairly and fully develop the record, but the ALJ "is not obliged to investigate a claim not presented at the time of the application for benefits and not

offered at the hearing as a basis for disability." *Mouser v. Astrue*, 545 F.3d 634, 539 (8th Cir. 2008) (internal quotations omitted).   An ALJ is only required to order a psychological consultative examination if the medical records presented to the SSA do not give "sufficient medical evidence to determine whether the claimant is disabled." *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) (quoting *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)). When determining a claimant's mental impairments, an ALJ may consider the following factors:   (1) the claimant's failure to allege mental impairments in his complaint; (2) failure to seek mental treatment; (3) the claimant's own statements; and (4) lack of medical evidence indicating mental impairment.   *Partee v. Astrue*, 638 F.3d 860, 864 (8th Cir. 2011).   "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis."   *Mouser*, 545 F.3d at 639 (quoting *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994)).   An ALJ may also discount a claimant's subjective complaints where, based on inconsistencies in the record, the subjective complaints appear evasive and self-serving.   *Snead v. Barnhart*, 360 F.3d 834, 836-37 (8th Cir. 2004).

The factors used in assessing the severity of a mental impairment support the ALJ's finding that Virnig's impairments were nonsevere.   First, Virnig did not allege mental impairments in support of her applications for disability.   This appears to have been a deliberate choice, given that Virnig received disability for mental impairments in the past and, in her own words, she was "taken off" disability by a physician in 2004. (Tr. 268.)   Second, Virnig did not receive mental health treatment during the relevant time period, February 14, 2004 through July 6, 2012.   In March 2012, she underwent a

consultation for depression, but she was not seeking treatment, she indicated she intended to treat herself with herbal remedies.  (Tr. 519-21.)  She said she would follow up with a counselor but there is no indication that she did so.  (Tr. 521.)

Third, Virnig testified at the hearing that her mental health issues did not presently affect her ability to work.  (Tr. 57.)  It was only with prodding by her counsel that she added she only worked short hours and did not let her mental problems interfere with her work.  (*Id.*)  Fourth, there is a lack of medical evidence of a severe mental impairment.  This is primarily because Virnig did not seek treatment for a mental impairment.  When she sought evaluation for chronic confusion in 2007, Dr. Dunphy recommended psychometric testing, but she apparently did not follow through because there are no such records.  Virnig denied psychological symptoms in her clinical review of systems.  (Tr. 456, 512.)  On a few occasions, however, she acknowledged anxiety and depression, although she did not seek treatment.  (Tr. 339, 555.)

Finally, the record as a whole supports the ALJ's findings that Virnig had no episodes of decompensation and only mild limitations in daily living activities, social functioning, and concentration, persistence or pace.  As the ALJ noted, Virnig lived an active life, home-schooling her daughter, raising farm animals, and working part time as a PCA.  The only evidence in the record of impaired social functioning is that Virnig tended to wander off topic in her thoughts or conversation, and she reported unusual reactions to medication.  This evidence is consistent with the ALJ's finding of mild limitation in social functioning.  The evidence of Virnig's meandering off topic is also evidence supporting only a mild limitation in concentration.  As the ALJ found, there is

no evidence of an episode of decompensation of extended duration.[15]   Substantial

evidence in the record as a whole supported the ALJ's finding that Virnig's PTSD and

depression, during the relevant period, were nonsevere impairments.

## 2.   The RFC Finding

Virnig asserts that the ALJ erred by failing to include in the RFC finding her

functional limitations from nonsevere mental impairments.   (Pl's Mem. at 10.)   She

asserts that omission of a nonsevere impairment in the RFC is grounds for remand.   (*Id.*

at 11, citing *Cooks v. Colvin*, No. 12-4177-KES, 2013 U.S. Dist. LEXIS 151407 [2013

WL 6729868], at *21 (S.D.S.D. Oct. 22, 2013)).   Virnig also contends that because her

arthritis in her right hand was a severe impairment, it was error for the ALJ to exclude it

from the RFC.   (Pl's Mem. at 12.)   The Commissioner contends the ALJ was under no

obligation to include mental limitations in the RFC assessment because Virnig failed to

demonstrate she had any mental limitations.   (Def's Mem. at 6-7.)   Similarly, the

Commissioner asserts substantial evidence supports the ALJ's finding that Virnig's right

hand arthritis did not cause serious limitations.   (*Id.* at 8.)   In reply, Virnig contends the

ALJ was required to include "impairments" and not just "limitations" in the RFC finding.

---

15

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace. . . . The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of  once every 4 months, each lasting for at least 2 weeks.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4).

(Pl's Reply at 5-6 citing *Hunt v. Massanari*, 250 F.3d 622, 626 (8th Cir. 2001) and 20 C.F.R. § 404.1529(d)(4)).

RFC is the most a claimant can do despite his or her limitations.  20 C.F.R. §§ 416.945(a)(1) and 404.1545(a)(1). When determining RFC, the ALJ must consider all medically determinable impairments, including those that are not severe.  *Id.* §§ 416.945(a)(2) and 404.1545(a)(2).   In assessing RFC, the ALJ must consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. *Id.* §§ 416.945(a)(4) and 404.1545(a)(4).   The ALJ evaluates the "nature and extent" of the claimant's limitations, and then determines RFC "for work activity on a regular and continuing basis."  *Id.* §§ 416.945(b) and (c) and 404.1545(b) and (c).  When a claimant has severe impairments but does not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ considers the limiting effects of all of the claimant's impairments, even those that are not severe, in determining RFC.   *Id.* §§ 416.945(e) and 404.1545(e).  In doing so, the ALJ must consider all of the medical and nonmedical evidence of record.  *Id.*

Here, the ALJ's decision reflects that he considered all of the medical and nonmedical evidence in the record, and that he considered Virnig's nonsevere impairments in determining her RFC.  The ALJ thoroughly discussed the evidence of record and gave reasons for finding Virnig's mental impairments nonsevere.  The ALJ found that the objective medical evidence did not support greater physical limitations, and Virnig's activities and conservative course of treatment for pain were inconsistent with her subjective limitations.  Indeed, the ALJ's RFC finding is supported by the state agency consultants' opinions.  And, the ALJ had good reasons, particularly Virnig's

demonstrated physical abilities based on her daily activities, for discounting Virnig's subjective complaints.  *See, Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) ("ALJs may discount claimants' complaints if there are inconsistencies in the record as a whole, and '[w]e will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" (quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted).

The remaining issue posed by Virnig is whether the ALJ was required to list Virnig's medically determinable impairments, as opposed to her limitations, in the hypothetical question to the vocational expert.  *See,* Pl's Mem. at 5 ("The Commissioner argues that only "limitations" should be included, but the Social Security regulations apply to impairments, not just limitations.")

### 3.    The Hypothetical Question to the Vocational Expert

Virnig argues that because the ALJ's RFC finding omitted impairments from her arthritis and mental health conditions, the vocational expert's testimony based on the RFC is not supported by substantial evidence in the record.  (Pl's Mem. at 12.)  The Commissioner asserts the ALJ's hypothetical question to the vocational expert was proper.  (Def's Mem. at 8).

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted).  "The hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete

consequences' of those impairments." *Lacroix*, 465 F.3d at 889 (quoting *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996)).  Social Security Ruling ("SSR") 96-8p, describing the SSA's policies and interpretations regarding assessment of residual functional capacity, provides that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . ."  1996 WL 374184, at *1 (S.S.A. July 2, 1996).  Thus, an ALJ captures the concrete consequences of a claimant's impairments by describing the claimant's RFC in terms of limitations on specific work-related activities.

The ALJ did not err by failing to include Virnig's PTSD and depression in the hypothetical question to the VE.  The ALJ reasonably concluded, based on substantial evidence in the record, that these impairments were nonsevere, and therefore he was not required to include the impairments in his hypothetical question.  *See*, *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) ("On at least one occasion, we have held that the ALJ did not err by excluding the claimant's mental limitations from the hypothetical questions to the VE, when substantial evidence supported the ALJ's determination that the claimant's mental limitations were 'nonsevere.'" (quoting *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998)).

The ALJ found that Virnig's arthritis in her hands limited her to lifting twenty pounds occasionally, ten pounds frequently, and avoid firm gripping and grasping with the non-dominant hand.  Thus, he included limitations from her arthritis in the hypothetical question.  The ALJ properly discounted Dr. Van Nostrand's opinion that Virnig could only occasionally lift ten pounds, relying on Dr. Van Nostrand's finding that Virnig's physical examination was essentially unremarkable.  The ALJ cited other

inconsistencies in the record, including the fact that Virnig was quite physically active. She admitted carrying five gallon buckets of water, raising animals, and working as a PCA.  Because substantial evidence in the record supports the ALJ's RFC finding, and the hypothetical question posed to the vocational expert captured the concrete consequences of Virnig's impairments, the ALJ's decision should be affirmed.

## III.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT**:

1.   Virnig's motion for summary judgment (Doc. No. 17) be **DENIED**;

2.   Defendant's motion for summary judgment (Doc. No. 19) be **GRANTED**; and

3.   If this Report and Recommendation is adopted, judgment be entered and the case dismissed.


DATE:   June 19, 2014

_s/Tony N. Leung_____
TONY N. LEUNG
United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **July 7, 2014.**